AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>a black iPhone assigned phone number<br>818-219-6447, the "SUBJECT DEVICE" | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No. 2:20-MJ-05940 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to Distribute Controlled Substances |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

*Michael F. Sier, Special Agent, Drug Enforcement Administration*
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _December 28, 2020_____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u>

Charles F. Eick, United States Magistrate Judge
*Printed name and title*

AUSA: Shawn J. Nelson, ext. 5339

## ATTACHMENT A

DEVICE TO BE SEARCHED

A black iPhone assigned phone number 818-219-6447, the "SUBJECT DEVICE."  The SUBJECT DEVICE has international mobile subscriber identity number 310150732976104, was seized from Guadalupe Edwin ZUNIGA on December 2, 2020, and is currently in the custody of the Santa Monica Police Department.

**ATTACHMENT B**

I.  **ITEMS TO BE SEIZED**

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21, United States Code Section 846, conspiracy to distribute controlled substances, namely:

a.   Records, documents, programs, applications and materials, or evidence of the absence of same, reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

b.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

c.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to

show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

d.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

e.    Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

f.    Contents of any calendar or date book;

g.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations

h.    Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense, and forensic copies thereof.

i.    With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents,

browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

       ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

       iii. evidence of the attachment of other devices;

       iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

       v.  evidence of the times the device was used;

       vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

       vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

       viii.    records of or information about Internet Protocol addresses used by the device;

       ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

       j.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records,

documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

II.   <u>**SEARCH PROCEDURE FOR THE SUBJECT DEVICE**</u>

In searching the SUBJECT DEVICE (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICE as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

e.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine

whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

        i.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        ii.   The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        f.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

        g.   If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

        h.   If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

i.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

j.   The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

k.   After the completion of the search of the SUBJECT DEVICE(S), the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

l.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

m.    During the execution of this search warrant, law enforcement is permitted to (1) depress Guadalupe Edwin ZUNIGA's thumb- and/or fingers onto the fingerprint sensor of the SUBJECT DEVICE (only if the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of Guadalupe Edwin ZUNIGA's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

n.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, Michael F. Sier, being duly sworn, declare and state as follows:

**I.  INTRODUCTION**

1.  I am a Special Agent of the United States Drug Enforcement Administration ("DEA").  I have been employed as a Special Agent with the Drug Enforcement Administration since September of 2012 and am currently assigned to the Los Angeles Field Division, Sensitive Investigations Unit.  I attended approximately 4 1/2 months of training at the DEA Training Academy in Quantico, Virginia starting in May, 2012, where I received  training in criminal law and procedure, surveillance operations, search warrant and report writing, undercover operations, confidential source management, money laundering and asset forfeiture, and specialized training concerning crimes in violations of the Controlled Substances Act contained within Title 21 of the United States Code and criminal conspiracies involving the smuggling and distribution of narcotics and dangerous drugs.  Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection of monetary proceeds of narcotics trafficking.  I am familiar with the unlawful importation, possession with the intent to distribute, and distribution of controlled substances, as well as the related monetary transactions involving the proceeds of specified unlawful activities, and conspiracies associated with criminal narcotics.

I have also received training on, and worked on several investigations involving narcotics related money laundering organizations.

2.    In conducting major narcotics/money laundering investigations, I have become aware of many techniques utilized by narcotics traffickers/money launderers.  I have learned that these individuals utilize various tactics to avoid detection and/or apprehension by law enforcement officials.  Techniques used by members of these organizations include the use of multiple locations, utilizations of numerous co-conspirators, the use of pagers, pay telephones, cellular telephones, cellular phone applications and software, and the use of hidden compartments in vehicles.

## II. PURPOSE OF AFFIDAVIT

3.    This affidavit is made in support of a search warrant for a black iPhone assigned phone number 818-219-6447, the "SUBJECT DEVICE" more fully described in Attachment A, for the items to be seized described in Attachment B, which are the evidence, fruits, and instrumentalities of violations of Title 21, United States Code Section 846 conspiracy to distribute controlled substances.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation

into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  SUMMARY OF PROBABLE CAUSE

5.    Leading up to December 2, 2020, a DEA confidential source arranged a methamphetamine transaction with Guadalupe Edwin ZUNIGA ("ZUNIGA"), who was using the SUBJECT DEVICE during the negotiations.  On December 2, 2020, agents arrested ZUNIGA, who was in possession of approximately 16 pounds of methamphetamine and the SUBJECT DEVICE.

### IV. STATEMENT OF PROBABLE CAUSE

**A.    Previous Investigation**

6.    On March 21, 2019, the Santa Monica Police Special Investigations Unit ("SIU") conducted a California ("CA") state search warrant of ZUNIGA's then-residence located at 19528 Leadwell Street in Reseda, CA. As a result of the search warrant, SIU Detectives seized approximately 9 ounces of suspected cocaine and approximately 300 pills of suspected alprazolam inside ZUNIGA's residence. Based on my training and experience, this amount was far greater than any amount for personal use and was consistent with that of possession for the purpose of sales by a drug dealer. Further search yielded $140,537.00 in U.S. currency. Based on my training and experience, it is common for drug dealers to be in possession of large amounts of money such as the above-mentioned currency. ZUNIGA was placed under arrest for being in possession of

3

cocaine and alprazolam for the purposes of sales as well as child endangerment in violation of CA state law.

     **B.**    **Recent Contact between the CS and ZUNIGA and Recent Surveillance of ZUNIGA**

    7.    In September 2020, a DEA Confidential Source (CS) provided information to investigators that ZUNIGA is a cocaine, methamphetamine, and heroin trafficker based in Southern California.[1]  The CS informed that approximately two years ago, the CS purchased approximately 25 pounds of methamphetamine from ZUNIGA.  The CS also stated that on or about September 23, 2020, via Snapchat, utilizing the Snapchat username elvalle726, ZUNIGA offered to sell the CS approximately six kilograms of cocaine.  Additionally, on September 29, 2020, the CS stated that ZUNIGA sent a message via Snapchat, in which ZUNIGA asked how much the CS would be willing to pay for a pound of methamphetamine. The CS also informed that ZUNIGA has heroin for sale and was currently in contact with the CS for the purpose of facilitating future drug sales.

    8.    On October 2, 2020, Detective Navid Khansari of the Santa Monica Police Department SIU obtained a CA search warrant to receive phone pings for the location of ZUNIGA's cellular phone. The warrant was signed by the Honorable Judge Bobbi

---

[1] The CS is currently cooperating in hopes of a reduced sentence in connection with a drug trafficking investigation. The CS has a criminal history that includes theft, providing a false statement and a probation violation. The CS has provided information in other DEA investigations, which have led to seizures and there is no derogatory information that has been developed with respect to his/her cooperation.

Tillmon, Santa Monica Courthouse, West Judicial District. The
pings showed in the general area of the intersection of Gilmore
Street and Lankershim Boulevard ("Blvd.") in North Hollywood,
CA.[2]

9.   On October 9, 2020, Detectives from the Santa Monica
Police Special Investigations Unit, as well as law enforcement
personnel from the DEA set up surveillance in the area of
Gilmore Street and Lankershim Blvd.  I was present for this
surveillance and my statements below are based on my own
observations, what I heard over the radio during the
surveillance, and from conversations with my fellow agents and
officers.

   *a.*   At approximately 11:30 a.m., ZUNIGA exited the
residence located at 11742 Gilmore Street, North Hollywood, CA,
("the Gilmore Residence"), and approached a red 2019 Honda
Accord that had just arrived on the street in front of the
Gilmore Residence. ZUNIGA completed an exchange of items with
the driver of the Honda. Based on my training and experience, I
believe this was a hand to hand narcotics transaction.  The
Honda left the area shortly after and ZUNIGA went back into the
Gilmore Residence.

   *b.*   At approximately 11:35 a.m., ZUNIGA exited the
front door of the Gilmore Residence and entered the driver door

---

[2] On October 7, 2020, Detective Khansari of the Santa Monica
Police Department signed an additional California state search
warrant for subscriber information, call detail records with
cellular location and use of a cell cite simulator for ZUNIGA's
cellular telephone.  The warrant was signed by the Honorable
Judge Bobbi Tillmon, Santa Monica Courthouse, West Judicial
District.

of a white Jeep Cherokee, which was parked in the driveway of the Gilmore Residence. This was an Enterprise rental vehicle. An unknown male/Hispanic subject then exited the Gilmore Residence and entered the front passenger seat of the Jeep. ZUNIGA and the unidentified male/Hispanic then drove to the intersection of Oxnard Street and Van Nuys Blvd. in Van Nuys.

   *c.*   ZUNIGA met with the subjects who were inside a white Dodge Charger, which was parked in a parking lot at the northwest corner of the intersection. ZUNIGA completed an exchange with the subjects in the Dodge Charger. Based on my training and experience, I believe this was a hand to hand narcotics transaction.  ZUNIGA then left the area separate from the Dodge Charger.  He drove to the area of Universal Studios and surveillance was subsequently concluded.

   10.  On October 15th 2020, Detectives from the Santa Monica Police SIU set up surveillance at the Gilmore Residence.  I was not present for this surveillance, but learned about it later from participating officers.[3]

   *a.*   At approximately 5:35 p.m., ZUNIGA arrived at the Gilmore Residence in a grey BMW X6. ZUNIGA was a passenger and was dropped off. The BMW left shortly after.

   *b.*   At approximately 6:05 p.m., an unknown male/white subject in his 40's arrived on foot and walked into the property

---

   [3] On October 21st, 2020, Detectives from the Santa Monica Police SIU set up an additional surveillance at the Gilmore Residence.  ZUNIGA was observed at the Gilmore Residence, however, no overt criminal activity was observed at that time. I was not present for this surveillance, but learned about it later from participating officers.

of the Gilmore Residence.  At approximately 6:10 p.m., a white Infiniti 2 door coupe arrived at the front of Gilmore Residence on the street. ZUNIGA exited the Gilmore Residence and completed an exchange with the driver of the Infiniti. Based on my training and experience, this was a hand to hand narcotics transaction.  The Infiniti left the area shortly after and ZUNIGA walked back into the Gilmore Residence.

c.    At approximately 6:10 p.m., a black Dodge Charger arrived at the front of the Gilmore Residence on the street. Two male/Hispanic passengers exited the Charger. One of the occupants removed a black backpack from the trunk of the Charger. Those two subjects then entered the Gilmore Residence and the Charger drove away.

d.    At approximately 6:30 p.m., a silver Toyota Corolla arrived at the Gilmore Residence and parked in the driveway. ZUNIGA opened the front gate of the Gilmore Residence driveway for that vehicle. At approximately 6:54 p.m., that same Corolla left the Gilmore Residence occupied by two unknown male/Hispanic subjects. At approximately 7:00 p.m., the two male/Hispanic subjects who arrived in the black Charger and left the Gilmore Residence separately. The subject who arrived with the backpack left in a ride share vehicle while the other left the area on foot.

e.    At approximately 7:00 p.m., an unknown male/white subject in his early 20's entered the property of the Gilmore Residence. At approximately 7:40 p.m., a grey Toyota Corolla with CA plate #4URY228 arrived on the street in front of the

Gilmore Residence. ZUNIGA exited the Gilmore Residence and made an exchange with the driver of the Corolla. Based on my training and experience, I believe this was a hand to hand narcotics transaction.  The Corolla left shortly after and ZUNIGA walked back into the Gilmore Residence.

     *f.*  At approximately 7:45 p.m., the unknown male/white subject in his 40's who arrived at 6:05 p.m. exited the Gilmore Residence. He walked westbound on Gilmore Street and entered a parked vehicle (black Mercedes sedan CA plate #8BTD353) and left the area. The surveillance was concluded shortly thereafter. Based on my training and experience, all of the above mentioned high volume foot and vehicle traffic coming and going from the Gilmore Residence is consistent with that of a residence where narcotics are sold.

    11.  On November 14, 2020, the CS participated in a phone call with ZUNIGA.  I have reviewed a recording of the conversation.  The CS asked for "waters" which is drug trafficking slang for methamphetamine.  The CS asked how many pounds of methamphetamine ZUNIGA would be willing to provide the CS on consignment in addition to how much the CS could purchase up front through ZUNIGA.  ZUNIGA responded that he was willing to supply a pound of methamphetamine for each pound the CS would purchase up front.  The CS and ZUNIGA agreed to a price of $3000 per pound of methamphetamine that was purchased up front, and $4000 per pound of methamphetamine that the CS would be provided on consignment.  During the course of the call ZUNIGA stated that if the CS would purchase 15 pounds of methamphetamine up

front he would supply an additional 15 pounds of methamphetamine on consignment totaling 30 pounds.

12.   On November 23, 2020, the CS texted ZUNIGA to update him on the CS' attempts to gather funds to by methamphetamine. ZUNIGA responded telephonically via text with "K."  Based on my training and experience I know "K" to be shorthand for "okay."

13.   On November 24, 2020, the CS and ZUNIGA had another telephone call in which they confirmed the transaction for the following week.  During this conversation ZUNIGA stated that he had an "office" which "nobody knows about."  While discussing the mechanics of the deal ZUNIGA stated that "you already know how we do it."  Based on my training and experience and knowledge of this investigation, I believed that the secret office could be a reference to a location in the SUBJECT PREMISES Gilmore Residence, but it may also be a reference to the San Fernando Valley or southern California generally because ZUNIGA knows that the CS is in Hawaii.

14.   The CS and ZUNIGA agreed to conduct the transaction at the Home Depot at 1200 South Flower in Burbank in the morning on December 2, 2020.

15.   On December 1, 2020, officers from the Santa Monica Police Department conducted surveillance of ZUNIGA.  Based on my conversations with those officers I learned that they followed GPS data to Willis Avenue and found a White Ford Expedition that is registered to ZUNIGA.  ZUNIGA left Willis Avenue in the Expedition with what appeared to be a wife and child.  ZUNIGA left with two large yellow bags that appeared to be heavily

weighted bags.  They drove to the Gilmore address, ZUNIGA got out of the Expedition and entered the Gilmore Street address with the weighted bags.  The wife and child left in the Expedition.  After a time, the wife and child returned and ZUNIGA got in the Expedition.  He did not have the weighted bags.  After driving to a couple other locations, they returned to Willis Street and a Santa Monica Detective saw ZUNIGA and his son enter Unit 6.  Surveillance was then terminated.  GPS data showed that ZUNIGA's phones returned to Gilmore about an hour later before again going back to Willis Street.

   **C.    Arrest of Zuniga on December 2, 2020, with
          Approximately 16 Pounds of Apparent Methamphetamine
          and the SUBJECT DEVICE**

   16.    On December 2, 2020, I and officers from the Santa Monica Police Department set up to conduct the undercover purchase operation against ZUNIGA.  Based on my conversations with the CS, my own observations, and conversations with other involved personnel, I learned the following:

          a.    Officers set up on Willis Avenue.  GPS data showed that the phone was away from the Willis Avenue location, officers tracked the GPS data and found the Expedition in the general area around and between Willis and Gilmore.  Officers followed the Expedition to Gilmore.  During that trip, ZUNIGA picked up an unknown male passenger.  ZUNIGA drove to the Gilmore residence and parked in the driveway.  A white Mercedes parked behind Zuniga.  ZUNIGA obtained a bag from the trunk of the Mercedes and put it in the back of the Expedition.  ZUNIGA then drove to the Home Depot.

b.    After ZUNIGA arrived at the parking lot of the
Home Depot.  ZUNIGA texted the CS to meet him on foot one block
south of the Home Depot.  The CS asked to meet in the parking
lot.  ZUNIGA stopped replying and left the Home Depot and went
Northbound on the 5 freeway, in the general direction of the
Gilmore location.  ZUNIGA was driving erratically in a manner
consistent with counter-surveillance or with ZUNIGA having
"burned" our surveillance.

c.    ZUNIGA exited at Penrose.  Officers stopped
ZUNIGA.  Officers obtained the bag from the Expedition.  The bag
contained what appeared to be methamphetamine that was tightly
wrapped in 8 plastic wrapped bundles.  On December 3, 2020, we
weighed the apparent methamphetamine and found that it weighed
approximately sixteen pounds.

d.    During a search of Zuniga's car, officers found a
receipt for a storage unit.  The receipt was found in the
"kangaroo pouch" behind the driver's seat, which was next to the
methamphetamine, which was right behind the passenger seat.  The
receipt indicates that the storage unit was rented on November 4
in the name of Brenda Torres, who I believe to be ZUNIGA'S wife.
On the same date, a federal search warrant was signed for that
location by the honorable U.S. Magistrate Alexander F. MacKinnon
and the search did not result in the seizure of evidence.

e.    During a search of the Gilmore residence, agents
found what appeared to be ZUNIGA's locked office on the back
side of the residence.  Inside that office, agents found a safe
that contained approximately 50 grams of what appeared to be

powder cocaine and a firearm that was unloaded but adjacent to a loaded magazine.

   f. On December 2, 2020, following the arrest of ZUNIGA, SMPD Officers Mora and Varak searched a hand bag which ZUNIGA was wearing at the time of his arrest on Penrose Street and seized the SUBJECT DEVICE.  The SMPD Officers then transferred custody of the SUBJECT DEVICE to SMPD Det. Navid Khansari on Penrose Street.  Det. Navid Khansari subsequently transported the SUBJECT DEVICE to the SMPD for storage and safekeeping.  On December 3, 2020, at approximately 2:47 p.m., Det. Navid Khansari called the SUBJECT DEVICE at the subject telephone number and it rang.

<h2 style="text-align:center;">V. <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u></h2>

  17. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

   a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

   b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of

12

illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.    Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences, vehicles, or in rented storage facilities.

g.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

### I.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

18.  As used herein, the term "digital device" includes the SUBJECT DEVICE.

19.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

14

know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

     a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

     b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

   c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

20. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

   a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

   b. Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000

average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

21.   The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

c.   The person who is in possession of a device or
has the device among his or her belongings is likely a user of

the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Guadalupe Edwin ZUNIGA's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of Guadalupe Edwin ZUNIGA's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

22.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. CONCLUSION

23.   For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of Title 21, United States Code Section 846 conspiracy to distribute controlled substances, will be found in the SUBJECT DEVICE, as described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
December, 2020.

_____
UNITED STATES MAGISTRATE JUDGE